May it please the Court, Helen Tompkins for the petitioner, and I would like to reserve five minutes of my time for rebuttal. The issue in this case is whether the administrative law judge may systematically ignore the detailed justification supporting claimant's counsel's attorney fee rate and simply import his own subjective view of what is an appropriate hourly rate. This case, this Court has already decided in Christensen and Van Skyke, which are parallel cases, that we're going to apply the rule of law in this arena. And the facts in this case are that the claimant's counsel presented detailed expert affidavits and surveys justifying his hourly rate of $400 per hour, and that the administrative law judge wholesale rejected all of that evidence and simply went out on his own and found a survey which he thought justified a significantly reduced hourly rate. We know from both this Court's case law and from the U.S. Supreme Court case law that the appropriate attorney fee hourly rate is one which is based on the prevailing market rates in the relevant community. Here it was established by counsel's evidence that the relevant community is Portland, not the entirety of Oregon, and that there is a substantial difference, and that was based on the testimony of the experts that was submitted that costs are higher in Portland and therefore hourly rates are higher in Portland, and there was evidence to that effect. Similarly, the ALJ aired when he imported workers' compensation rates, because, again, the evidence established that workers' compensation rates are skewed. And I would direct the Court's attention to the table that the ALJ created at the excerpt, page 19, in which it's painfully obvious that the workers' compensation rates, hourly rates, are skewed rates. Let me just clarify one thing. Didn't the ALJ take two, look at this twice? He did. Okay. And after he took a look at it the second time, didn't he change his, take another look at their hourly rates and adjust them upward? Slightly. Didn't he get a little bit more money? Slightly upward. The flaw, though, Your Honor, in the ALJ, which is not unfettered discretion, has to be grounded in some reason. Right. Both. You know, I looked at this, and I just, you know, maybe the judge could have given more. Could have given a little less. He gave a reasoned explanation for his, how he arrived at his decision. And it's hard, at least for me, to say that that was an abuse of discretion. Right. And, Your Honor, I think that's where we disagree, is the reasoned explanation is not that at all. In fact, if you read the ALJ's decision, he, for no logical reason, simply rejects all of the testimony. The testimony that was offered in support of the $400 an hour rate, first of all, was by the leading experts on attorney fees in the Portland community. Mr. Markowitz, Mr. Crow, Mr. Goldsmith, and the deposition testimony of Mr. Skerritt were all offered in support of establishing what the rates are in the prevailing market, what prevailing rates are in the relevant market. And the ALJ wholesale rejects all of that evidence. And even though the Army agreed that the relevant community was Portland, where rates are higher, the ALJ arbitrarily chose to look at the remainder of Oregon. The other interesting thing about what the ALJ did, and this is at page 20 of the record, is the ALJ said that the claimant's counsel in this case met but didn't significantly exceed my expectations. And that imports a subjective, and I think erroneous, subjective interpretation of the performance of counsel. At one point, he said that counsel had been careless and made some mistakes. I don't know what those were or whether there's merit to them. But that's what the ALJ said. He was looking at the performance of this particular lawyer. I gather that this lawyer is an expert in the field, and he handles many of those cases, and I think that the bar is trying to establish a higher rate. This fellow says, I shouldn't be in the top 25 percent. I should be in the top 5 percent. Well, that's maybe a little bit overblowing what he really is worth. I don't know. But I can understand that an appropriate rate should be established. And I think this ALJ struggled with it and did the best that he could. And maybe you can find a lawyer who was performing perfectly to bring another case and establish a different rate. But this particular lawyer, I think, was a bit affronted at the fact that he wasn't considered the top guy. Your Honor, let me make a correction. First of all, the suggestion that an ALJ said that there were mistakes made, that was actually ALJ G, G-E-E, a female ALJ. And her decision, including that finding, was overturned by the board. And that's in the supplemental excerpt. Was that particular finding overturned? Well, the board rejected her conclusion and raised the rate to $384 per hour for this specific attorney. And the other thing I want to address, Your Honor, a great analysis. It's not just that we have a disgruntled claimant's attorney who would prefer to be paid more. I think it speaks to Congress's intent in creating this statute and making sure that attorneys who do this work, who do claimant's work, and successfully, again, we have evidence that this was 100% successful in the representation that he did, with 40 years of experience specializing in this area of law, that he be paid commensurate with the work he could do in another arena. And that's why the Supreme Court said in Blum, we're going to look at the relevant community. So he should get paid at a rate that he could have perhaps be an antitrust litigator? Is that what you're saying? Similar services in the relevant community. And so that's why the Markowitz affidavit, the Crow affidavit, the Morona survey of commercial litigation, and that includes ERISA, that includes antitrust, it includes a number of arenas where some of which are privately paid, some of which are fee awards. It says that for someone with his level of experience and his expertise and reputation in the community, that those folks are earning between $400 and $450 an hour. So that if we're going to satisfy the congressional intention that these people be paid commensurate, that the rate has to be $400 or above. And it's not appropriate. I think the most striking thing. What was it? The final rate was $309? Correct. Even though the board in what's before this court in the record is at $300. Is that chump change? Not at all. But it's not commensurate with the rates that are prevailing in the Portland community. And I think the most egregious thing, and the thing that should get this Court's attention in reversing the ALJ, is that it's not appropriate for the claimant's counsel to come forward with solid evidence, expert testimony, surveys, and for that to be wholesale rejected in favor of the ALJ's subjective determination of what he thinks is appropriate. That was what was criticized by this Court in Van Skuyk and Christensen. And I think it's interesting, in Van Skuyk, at page 1047, this Court said that counsel had come forward with detailed justification for his hourly rate. Well, it's the same evidence that was wholesale rejected by this ALJ. This Court actually characterized it as detailed justification for his hourly rate. Did you want to take some time for rebuttal? I do. And so I think what's critical for this Court to do is to address the fact that we're going to follow the rule of law. We're going to pay attention to the evidence that's presented that establishes the prevailing market rate in the relevant community and not permit a mere subjective determination to trump that. Okay. Thank you. Thank you, Your Honor. My name is Adam Jett. I'm representing the Army NAF in this case. Sure. May it please the Court, if I could actually just begin with the colloquy between actually both Judge Fletcher, Judge Paez, and my opposing counsel. She continues to emphasize here that, in her view, Judge Etchingham just imported his own subjective view of the rates. And I just want to make clear that that's not actually what happened in this case. It's not that he pulled some number out of thin air. First of all, he found that Mr. Rabinowitz had not met his burden and gave a very lengthy explanation as to why that was the case. Second of all, he looked at a well-respected national survey and used that to establish the rates, not just pulling numbers out of thin air. And third, Your Honor, I just want to point out that the rate that he came up with, $309 an hour, was substantially larger than the rate which the Army had recommended. And the Army's recommended rate was based on a different well-respected survey, the survey that actually the District of Oregon refers to as the gold standard. So just to make clear, this wasn't a purely subjective determination of rate. Rather, this was a determination of rate where he was really doing his best to try to approximate the sort of work being done by a longshore workers' compensation lawyer. And so he looked at five different sorts of work which are at least similar to longshore workers' compensation, evaluated those various rates, and gave Mr. Rabinowitz $309 an hour. Let me ask, was he really using the whole State as his proxy rather than the Portland area? Yes, Your Honor. What Judge Etchingham did here is he had the Army's survey where the Army's data was Portland-specific and recommends at a rate between 275 and 285. And rather than using that, he said, you know, that survey isn't quite as specific to practice area. It just gives more general views of litigation rates. And in order to try to more closely approximate the rates for longshore work, Your Honor, he looked instead at the Altman Whale survey. And now the Altman Whale survey didn't have data that was specific to the city limits of Portland. Rather, it had data for the District of Oregon, the language I think this Court has used is the jurisdiction where the District Court sits. And as a result of relying on that data, he gave Mr. Rabinowitz more money than the Portland-specific survey had recommended, $309 an hour. Well, that is the aspect of the case that bothers me a little because quite clearly it should be based on what a lawyer would expect in Portland. Is that not right? Well, Your Honor, I'm not sure that I actually agree with that. I guess there are three things that I'd like to say in response to that. The first, of course, is that when you're dealing with longshore cases, it's not entirely clear what the relevant geographic community is. So the initial hearing was held in Alaska. Longshore District 10 covers much of the western United States. The particular attorney who performs the work here was performing his work in Oregon. So just to be clear, there's a real question as to what the right geographic community is, and I think the Department of Labor has been trying to figure that out. With respect to the question of whether it should be Portland, Oregon versus the State of Oregon, I'll say first of all that this Court, amongst others, have said that it is at least permissible to use rates from the forum in which the District Court sits, and here the forum is the District of Oregon. So, for example, that rule in the Ninth Circuit originates from the Davis case, actually not the Davis case that we cite in our brief, but a different one. The site is 927F2nd at 1488. And there they say the relevant community is where the District Court sits, and they're referring to the Western District of Washington, which presumably, like the District of Oregon, has urban areas and has rural areas. In the longshore context, Your Honor, I know of at least one case, the Jeff Boat case in the Seventh Circuit, where they used rates from the District of Connecticut, which obviously covers some urban areas. I'm sorry, Your Honor. No, go ahead. Which obviously covers some urban areas and some rural areas. The other point that I would just make, Your Honor, is it's by no means clear that the rates for the same kind of work vary substantially between Portland and the State of Oregon, and I think that's something that got a little bit confused in the brief, so I just want to make that very clear. If you look at certain averages, some of the averages are higher for Portland, but obviously there are certain just kinds of work being done in Portland, you know, high-value commercial litigation, which necessarily will be paid more, and necessarily more of that goes on in a city like Portland, Oregon. So if I could direct you, for example, to excerpts of record page 52, there they have broken down by certain practice areas in different geographic locations, and, for example, for general civil litigation, the averages between Portland and the District of Oregon are 245 versus 249. The 75th percentile is 282 versus 285. So, I mean, just to point out, it's not clear that once you actually focus in on a particular practice area in a particular category that those totals are going to vary. The very last thing I would say in response to your question, Judge Fletcher, is just that there needs to be some sort of a workable rule, and here, even if we tried to determine Mr. Rabinowitz's rates more specifically than the District of Oregon, and even if we decided that to do that it was worth sacrificing the better survey with more specific practice areas, nonetheless, there would still be a question of do you use exact Portland city limits? Do you use the tri-county area around Portland? And, of course, for other cases that don't go on in Portland, you may have even a bigger problem. If it happens, you know, in some city 200 miles west of Portland, presumably there's not going to be much data about what goes on within those city limits. And so that's why, as I understand it, this Court and other courts have said, at the very least, it's permissible to use rates for the form in which the district court sits. It's a bright line, and necessarily when you have bright lines, sometimes it may be a little bit under-inclusive or a little bit over-inclusive. But it's still a uniform group of lawyers that compete against each other for a great deal of work. And here, whether Your Honor would have chosen that rate in the first instance is one question, but whether the ALJ abused his discretion by doing so, we don't think that he did, unless there are any other questions, Your Honor. No. Thank you. Thank you, counsel. Rebuttal. May it please the Court, I'd like to respond to the suggestion that the survey that the ALJ used is somehow appropriate or that it's a good survey to use. We don't know. The survey is not in the record. It was not something that was available to counsel. It was not cited by either side in these proceedings. And I think this is partly why we're critical of the ALJ's decision in this case, is that he went out and found a survey that he thought was somehow appropriate. And we don't know, as we speak, as we're here today, considering this issue what geographic area was covered, whether it covered attorneys like Mr. Rabinowitz with more than 40 years' experience doing this specialized type of work highly successfully. And the other critique that we have of the ALJ's decision is that the entirely subjective suggestion that Mr. to quote his words, he said that Mr. Rabinowitz met but didn't significantly exceed his expectations. Well, recall this record demonstrates that there were no proceedings in front of this ALJ. It's not like you had a district court judge who conducted a three-week trial and had an opportunity to observe the attorneys at work. In fact, before he ever approached the ALJ for an award of attorney fees in this case, Mr. Rabinowitz had been entirely successful in recovering for his claimant over resistance by the Army. I have a question you might clear up for me. Was the initial request $11,000? That sounds appropriate, Your Honor. This case has been through a number of stages of reconsideration and appeal and remand. What was kind of peculiar to me is that the ALJ awarded $13,000, so it was $2,000 more than you initially requested. The other thing about that, Your Honor, to be clear is that, I'm sorry, in between the proceedings additional time was spent. So, for example, however many hours were included in the initial request, when there were items for reconsideration, then additional time went into that. And the other thing that is interesting is this matter concluded substantively in December of 2007. And we're here in 2012 debating the appropriate hourly rate. And so, you know, my suggestion is simply that the economy has gone down. That's what they tell me. That's not been my experience. But, you know, the other comment I want to address is the suggestion by opposing counsel that the rates that are in the record are for high-value commercial litigation. And I think that really screams at what Congress feared would happen, is that if we demean and diminish work on behalf of claimants, we're not going to meet that congressional intent that highly skilled, qualified attorneys are going to be attracted to do this kind of work on behalf of claimants. And I would point the Court's attention to the affidavit of Mr. Crow. He goes through a lot of detail talking about his involvement with the Professional Liability Fund, his experience as an arbitrator on attorney fee awards in Oregon. He speaks specifically to Mr. Rabinowitz about his reputation, his skill level, the esteem with which he's held by his colleagues, and goes on to describe how the work in long short cases is similar to the work that's done in commercial cases and why, therefore, it's appropriate for Mr. Rabinowitz to be compensated in accord with the rates that are prevailing in the community. As Judge Fletcher pointed out, the record established that Portland is different, that hourly rates in Portland are higher. And that's what guidance we got from the Oregon or from the U.S. Supreme Court that we're looking at the relevant community and prevailing rates for similar services. And where counsel has fully documented that and supported his request for $400 an hour, it was not only an abuse of discretion, but also a failure to follow the law by the ALJ. And, therefore, we would seek that this court reverse that decision. Thank you.
judges: Hug, Fletcher, Paez